Filed 7/12/13  P. v. Enriquez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESSE ENRIQUEZ,<br><br>    Defendant and Appellant. | B242980<br><br>(Los Angeles County<br>Super. Ct. No. KA095961) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Juan Carlos Dominguez, Judge.  Affirmed.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

Defendant Jesse Enriquez was charged by amended information with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(2); count 1), and with being a felon in possession of a firearm (§ 12021, subd. (a)(1); count 5). The information also included gang and two prior strike allegations (§ 186.22, subd. (b)(1)(A) & (B), § 667, subd. (a)(1), 667.5, subd. (b)).[1] The jury found defendant guilty of both counts and found all special allegations to be true. The trial court denied defendant's *Marsden*[2] and *Romero*[3] motions. Defendant was sentenced to an aggregate term of 64 years to life, consisting of 25 years to life for count 1, plus a determinate term of 5 years under section 667, subdivision (a)(1), and 5 years under section 186.22, subdivision (b)(1)(B). He received a consecutive term of 25 years to life on count 5, plus an additional four-year term under section 186.22, subdivision (b)(1)(A).

Defendant appeals his conviction. We appointed appellate counsel to represent him. Appointed counsel filed a brief in which no issues were raised. (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).) The brief included a declaration from counsel that counsel reviewed the record and advised defendant of his right, under *Wende*, to submit a supplemental brief. Defendant did not file a supplemental brief with this court.

The facts are these: On the morning of October 29, 2011, D.A., who was confined to a wheelchair, was retrieving something from the trunk of his Volvo. The Volvo was parked in front of his wife's grandmother's home on Carlton Avenue in Pomona. A group of eight or nine young African-American men were gathered across the street. D.A. heard one of the young men say something, and when he looked up, they were all running. D.A. saw a car driving down the street. A gun was sticking out the driver's side passenger window. The car stopped and two "Mexican" men got out. One of them started shooting towards the group of African-American men. Bullets hit D.A.'s truck, which was parked in front of his Volvo. D.A. was unable to identify defendant in court.

---

[1]     Defendant's girlfriend, Rosemary Perez, was charged with being an accessory after the fact (Pen. Code, § 32; count 3). She entered a plea under a grant of immunity.

[2]     *People v. Marsden* (1970) 2 Cal.3d 118.

[3]     *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

On the day of the shooting, L.B. was at her boyfriend H.P.'s parents' house on Carlton Avenue. As L.B. and H.P. were leaving in L.B.'s car, "a Ford Focus came driving by really fast." The Focus was driven by a "Latina" female, and had three or four male passengers. L.B. pulled onto Carlton Avenue behind the Focus and noticed a group of African-American males, and a man in a wheelchair. The Focus parked and suddenly, a man ran into the middle of the street with a gun. When L.B. heard gunshots, she put her car into reverse and drove back to H.P.'s parents' house. H.P. dragged her into the house. The group of African-American men scattered; one of them followed L.B. and H.P. into the house. L.B. did not see the shooter's face. He was wearing a large brown hooded sweatshirt. He looked "Latino." She could not identify defendant as the shooter.

M.D. had been sitting in his car on Carlton Avenue. Some African-American 357 Crip gang members were hanging out in front of his neighbor's house. M.D. saw them scatter and then noticed a car driving by. The driver's side passenger was holding something resembling a gun out the window. After the car passed by, M.D. heard gunshots.

Defendant's girlfriend, Rosemary Perez, testified she was a codefendant in this case and had been identified by a witness during the preliminary hearing. She thereafter gave a proffered statement to the district attorney. Before the interview, she was not offered immunity or leniency in her case. She understood if she was not truthful, she could be charged with perjury or obstruction.

The morning of the shooting, after Perez and defendant spent the night together at Perez's house, they decided to get breakfast before Perez went to work. As Perez was driving, they saw a friend of defendant's walking down the street. Perez had seen him before at family gatherings. She knew him as "Primo" or "Chase." Defendant got out of the car to talk to Chase and asked Perez to give Chase a ride. Defendant let Chase sit in the front seat because the backseat was full of defendant's personal belongings. Defendant sat behind Perez. Defendant told Perez where to drive, and then Chase and defendant began to argue in Spanish. Perez did not understand what they were arguing about and was confused about where to drive.

She drove around for awhile, and then threatened to drop defendant and Chase off where she had picked up Chase because she was in a hurry to get to work. Perez was driving fast. Chase told her to slow down because "he was heated." Perez understood this to mean either that he had a gun, or that he was mad. Chase then gave Perez directions, but defendant gave conflicting directions. Perez decided to follow defendant's directions. As she turned, she saw a group of African-American males on the side of the road. Defendant and Chase continued to argue, and then Perez heard gunshots. Perez saw a black gun outstretched from the backseat of her car, where defendant was sitting. She heard Chase say, "Where [are you] from?"

Chase told Perez several times to stop the car. She stopped after Chase pulled out a gun. Both Chase and defendant got out of the car, and Perez heard gunshots. Perez ducked and then saw defendant running back to her car. She did not see a gun in his hands. She saw a silver gun in Chase's hand. Perez heard Chase say, "Happy Town." After defendant and Chase got back into the car, they argued again in Spanish. She asked what had happened, but neither Chase nor defendant answered her. Perez drove to the other side of town, and dropped off defendant and Chase. Perez did not go to the police because she was scared.

Defendant called Perez later that day, and they went to the beach around 9:00 p.m. She asked defendant what happened. He said there had been a shooting, and "everything was gonna be okay." After the beach, Perez and defendant drove to a friend's house (the Cesenas), and then to Perez's house. As Perez was inside changing her clothes to attend a Halloween party, defendant came to her bedroom window and handed her a gun. She put it in a shoe box in her closet, and they left for the party.

Perez had seen defendant with a gun before. She believed he got it from a member of the Cesenas family. Perez identified Chase in court. His name was Victor Gomez.

The day after the shooting, as Perez was leaving the Cesenas's house, she was pulled over by police. When she was initially questioned, she denied she was present at the shooting. However, after police told her she had been identified, she admitted to

4

being the driver. She did not identify defendant because she was scared. She identified Chase because she felt he was the one responsible for the incident.

When Perez's mother visited her in jail, Perez asked her to get rid of defendant's gun. She told her mother to contact the Cesenas family, which was Perez's only way of contacting defendant. When Detective Jerry Uribe later confronted Perez about her conversation with her mother, Perez admitted defendant was involved in the shooting.

On cross-examination, Perez admitted she entered into a plea agreement for probation and a suspended prison sentence in this case. At the time of her testimony, she had not been sentenced. She was told if she did not testify truthfully, she would be prosecuted and the deal was off.

A.R., Perez's cousin, testified defendant called her and arranged to meet with her in person. Defendant told her Perez had been arrested. He asked A.R. to retrieve a gun from Perez's house, and A.R. agreed to do so.[4] Defendant, another male, and a female picked up A.R. to drive her to Perez's house to recover the gun. A.R. agreed to help defendant because she knew children lived in Perez's home, and she was scared they would get hurt. Defendant told A.R. the gun was hidden under Perez's mattress, and she found it there. A.R. concealed the gun in her jacket and threw the gun into the car's backseat. Defendant and the others then drove A.R. home.

Detective Uribe investigated the shooting. He participated in defendant's interview after his arrest. Defendant admitted to being present at the shooting. He denied he was the shooter, or that he knew the shooting was going to occur. Defendant was in the car with his girlfriend, Perez, and "Chase." Chase told Perez to stop the car. Once the car stopped, defendant heard a bunch of gunshots. He also got out of the car, but ducked down. When Detective Uribe asked defendant why he got out of the car, he said he did not know why.

Defendant admitted he had given a gun to Perez to hold for him, but he denied it was the gun used in the shooting. As for the gun used in the shooting, defendant

---

**4** Defense counsel proposed A.R. should have a lawyer. She consulted with a court-appointed attorney, who advised her to invoke her Fifth Amendment right to remain silent. She ignored his advice and elected to continue her testimony.

admitted to knowing where it was, but refused to tell Detective Uribe its location. Defendant admitted to telling his girlfriend's cousin to dispose of his gun, as he knew a search of his girlfriend's house was imminent following her arrest. Defendant also admitted to being a gang member. A video of the interview was played for the jury.

Detective Eric Berger testified as a gang expert. He testified about the Happy Town gang, and that members of the Cesenas family are "deep rooted within the Happy Town gang." Defendant is a Happy Town gang member with the moniker "Bams." Victor Gomez, or Chase, is a Happy Town member with the moniker "Sniper."

Happy Town and the 357 Crips are rival gangs. The shooting took place in 357 Crips territory. There had been several skirmishes between the two gangs leading up to the shooting. Based on a hypothetical tracking the facts of this case, Detective Berger opined the shooting was for the benefit of the Happy Town gang.

We have examined the entire record, consisting of two volumes of clerk's transcript, two volumes of reporter's transcript, and a sealed *Marsden* transcript, and are satisfied that appointed counsel fully complied with counsel's responsibilities and that no arguable appellate issues exist. (*People v. Kelly* (2006) 40 Cal.4th 106; *Wende*, *supra*, 25 Cal.3d 436.) We therefore affirm the judgment.

## DISPOSITION

The judgment is affirmed.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.

6